## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 08-20705-CIV-MORENO/TORRES

EDUARDO GALIANA,

      Petitioner,

vs.

WALTER A. MCNEIL,
SECRETARY OF THE DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

### REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF
### HABEAS CORPUS PURSUANT TO TITLE 28 U.S.C. § 2255

      This matter is before the Court on Petitioner Eduardo Galiana's Petition for Writ of Habeas Corpus pursuant to Title 28 U.S.C. § 2254.  [D.E. 1].[1]  Petitioner submitted a Memorandum of Law in Support of Movant's Petition to Vacate Judgment and Sentence Pursuant to 28 U.S.C. § 2254.  [D.E. 2].  Respondent Walter A. McNeil, Secretary of the Florida Department of Corrections ("Respondent"), responded [D.E. 15] and Petitioner replied thereto [D.E. 21].  The parties also filed supplemental briefing on certain issues in accordance with our directive to do so [D.E. 22]: Petitioner's Supplemental Brief [D.E. 23], Respondent's Supplemental Brief [D.E. 27], and Petitioner's Response to Respondent's Supplemental Brief [D.E. 29].

---

[1]     The Honorable Federico A. Moreno referred this matter to the undersigned Magistrate Judge for all pretrial proceedings.  [D.E. 3].

The Court has carefully reviewed the pleadings and the record in this matter, including the record and trial transcripts in the underlying state court proceeding. For the reasons that follow, we recommend that the Court deny the Petition for Writ of Habeas Corpus.

## I.   BACKGROUND[2]

### A.   *Procedural History*

Petitioner was charged with two counts of DUI manslaughter, two counts of vehicular homicide, one count of leaving the scene of a crash with a death, and one count of unlawful driving as an habitual traffic offender, for crimes occurring on May 29, 2000 and resulting in the deaths of Giovanny and Yanick Amador. On March 22, 2002, Petitioner was convicted after a jury trial of two counts of DUI manslaughter, two counts of vehicular homicide, and one count of leaving the scene of an accident involving property damage.[3] He was sentenced on May 10, 2002 to two consecutive fifteen (15) year terms for the DUI Manslaughter counts and a consecutive sixty (60) day sentence for leaving the scene of the accident.[4]

---

[2]   The background is based on the Petition and Memorandum of Law in Support thereof [D.E. 1 & 2]; the state's Response in opposition thereto [D.E. 15]; and the record that was filed in this matter. [D.E. 17 (Appendix to Record) & 18 (Trial Transcripts)].

[3]   Petitioner also pled guilty to the habitual traffic offender count which was severed before trial. The five-year sentence imposed for this offense ran concurrent with the other sentences imposed in the case.

[4]   Sentence was suspended on the two counts of vehicular manslaughter. These counts were eventually dismissed following direct appeal and remand based on *State v. Chapman*, 625 So. 2d 838 (Fla. 1993) (a single death cannot support convictions for both DUI manslaughter and vehicular homicide).

On June 7, 2002, Petitioner timely filed a notice of appeal, and thereafter argued on direct appeal that the trial court erred in: (1) denying defense counsel's motion for mistrial based on the prosecutor's closing arguments which appealed to the sympathy of the jury for the victims and which injected elements of emotion and fear by raising the specter of the defendant committing additional crimes; (2) denying the defendant's motion to exclude the results of his blood alcohol tests where the state failed to establish that the tests had been properly performed so that the test results were scientifically reliable; (3) overruling the defendant's objection and allowing the state's accident reconstruction expert to testify that "to the exclusion of all reasonable doubt," the defendant was traveling at a speed of 88 miles per hour at the time of impact; (4) entering judgments of conviction and sentences for two counts of DUI Manslaughter, both of which arose out of a single automobile accident, where the unit of prosecution permitted but a single conviction; and (5) entering judgments of conviction for both DUI Manslaughter and vehicular homicide based on a single death.

On March 17, 2004, the Third District Court of Appeals issued an opinion *per curiam* affirming in part and reversing and remanding in part: "We affirm Galiana's conviction for DUI manslaughter, driving as an habitual offender, and leaving the scene of an accident. We remand, however, for the trial court to dismiss the two counts of vehicular homicide." *Galiana v. State*, 868 So. 2d 1218, 1219 (Fla. 3d DCA 2004).

On September 23, 2004, Petitioner filed a Motion for Post-Conviction Relief pursuant to Fla. R. Civ. P. 3.850 in the state circuit court. He alleged that he did not receive effective assistance of counsel when his attorney: (1) coerced and misadvised

him into not testifying by advising him that if he chose to testify, the state would be allowed to introduce his prior convictions which were DUI convictions and driving without or with license suspended; (2) failed to properly invoke the rule of sequestration when the state's accident reconstruction expert, Dr. William Fogarty, remained in the courtroom while defense expert witness Rick Swope testified, or have the state show why it was necessary for Dr. Fogarty to remain in the courtroom; and (3) failed to timely object, notify the trial court or have the trial court remove or reprimand a juror who had fallen asleep during critical portions of the trial even after being advised by the defendant that the juror was asleep.  Petitioner further alleged that his sentences for DUI manslaughter and leaving the scene of an accident involving property damage were in violation of the Sixth and Fourteenth Amendments to the United States Constitution, and that they ran afoul of the rule in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004).  The motion was denied by court order signed on July 29, 2005.  A motion for rehearing was denied on August 18, 2005.

Petitioner timely appealed the denial of his post-conviction motion to the Third District Court of Appeals, which affirmed *per curiam* on January 17, 2007.  *See Galiana v. State*, 952 So. 2d 1199 (Fla. 3d DCA 2007).  A motion for rehearing was timely filed and denied on March 27, 2007, and the Mandate issued on April 13, 2007.

On April 9, 2007,a few days before the Mandate in the 3.850 proceeding had been issued, Petitioner filed a "Resubmitted Motion for Post Conviction Relief, 3.850(f)" in which he claimed ineffective assistance of post-conviction counsel in connection with

the prior 3.850 motion.  Specifically, Petitioner claimed post-conviction counsel had been ineffective at the evidentiary hearing on the 3.850 motion because counsel had failed to (1) call as a witness the juror whom Petitioner alleged had been sleeping during his trial and (2) object to certain testimony regarding the trial judge.  The trial court denied this motion on April 12, 2007 as being "successive to 3.850 and not cognizable under 3.800."  The trial court also denied Petitioner's motion for rehearing on April 24, 2007, a ruling that Petitioner appealed on May 2, 2007.

On appeal, Petitioner argued that the trial court erred in summarily denying his resubmitted Rule 3.850(f) motion without an evidentiary hearing or attaching specific portions of the record that conclusively demonstrated he was not entitled to relief.  On March 5, 2008, the Third District Court of Appeal affirmed *per curiam* the denial.  *See Galiana v. State*, 976 So. 2d 1116 (Fla. 3d DCA 2008).  The Mandate issued on March 24, 2008.

Petitioner filed the pending Petition for Federal Habeas Relief on March 18, 2008.  [D.E. 1].  In it, he raises the following issues:

> **GROUND 1:**     Petitioner's Constitutional rights to a fair and impartial trial were violated when the trial court allowed the prosecution to make improper comments during opening and closing statements over defense objection, appealing to the emotions and fears of the jury.
>
> **GROUND 2:**     The trial court erred in denying Petitioner's Motion to Exclude the results of his blood alcohol tests as hearsay in violation of the Confrontation Clause and as not being scientifically reliable.
>
> **GROUND 3:**     The trial court erred in overruling Petitioner's objection and allowing the State's accident reconstruction expert

to testify that "to the exclusion of all reasonable doubt," the Petitioner was traveling at a speed of 85 miles per hour.

[D.E. 2 at 9, 12, 17].

### B.    _Factual Background_[5]

Petitioner's conviction stems from a tragic automobile collision occurring on May 29, 2000 that resulted in the deaths of two children. Marlene Amador was driving with her two children, thirteen-year old Giovanny and eleven-year old Yannick, when their car was struck from behind by a truck traveling at great speed. Petitioner, who had been visiting a friend at a party in the area and drove away loaded with alcohol in his system, drove the truck that crashed into Ms. Amador's car. Both children died from injuries sustained in the crash.

### 1.    _Pretrial Motion to Suppress or Exclude Supervisor's Testimony Regarding the Results of Certain Blood Alcohol Tests_

Prior to trial, the defense moved to suppress or exclude the results of tests performed on blood taken from Petitioner at the scene of the accident.[6] Petitioner argued that the blood alcohol tests had not been properly performed and were scientifically unreliable and that admission of the results through the testimony of the person who _supervised_ the two toxicologists who had performed the tests, rather than through the toxicologists themselves, constituted inadmissible hearsay in violation of

---

[5]    We have included a summary of those facts most relevant to the issues raised by the Petition.

[6]    The test results for blood drawn from Petitioner later at the hospital are not at issue in this case.

the Confrontation Clause.  [D.E. 2, Ex. D (Petitioner's pre-trial "Motion to Exclude or Suppress Blood Reading Evidence") at ¶ 8].

The only person the state called at the pretrial hearing to testify about these blood alcohol tests was Chip Walls, the Technical Director of the Forensic Toxicology lab in the University of Miami School of Medicine's Department of Pathology.  Walls explained that he supervised the forensic toxicology lab and, although he did not perform the blood alcohol tests on Petitioner's blood, he directly supervised the employees who did.  Those employees, toxicologists Richard McClure and William Genaro, did not testify at any point in this case.[7]

As supervisor, Walls stated he was "responsible for the interpretation of test[] results, evaluation, day-to-day activity, review of all toxicological test results, putting information into a computer, demographics, information checked by myself a second or third time before the data goes out."  [D.E. 18, T. Vol. 10 (Transcript of March 14, 2002 Suppression Hearing) at 41].[8]

---

[7]     McClure died prior to trial and was not examined by Petitioner.  As for Genaro, the state attempted, unsuccessfully, to determine why he was not called to testify in the case.  [D.E. 27 at 31-34].  All we know is that Petitioner did not examine him about the analysis he performed on Petitioner's blood.

[8]     Walls acknowledged that he did not hold a FDLE permit that would allow him to test blood for DUI impairment purposes.  However, he described his expertise in this area, including his having conducted more than a thousand blood alcohol tests over the years, he role as technical director in the forensic lab, and his being qualified in numerous state and federal courts of law as an expert in the field of forensic toxicology and specifically in the testing of blood for the presence of alcohol.  Importantly, he testified that the employees he supervised and who tested Petitioner's blood did possess current FDLE licenses when they performed the tests.

Walls described the methodology and protocols for blood analysis employed in his lab.  To determine the blood alcohol content in a specimen, the lab used a gas chromatography head space analysis utilizing international standards.  The instrument was calibrated every day it was used, and the calibration was checked and verified "by running of the controls prior to the running of unknown or forensic blood/alcohol determinations."  [*Id.* at 56].  Several controls were run each day, certain data was reviewed, and the controls were required to match their targets.

Walls stated that the gas chromatograph operated "under the control of a computer program that runs the software" that "runs the analysis and [data] is being printed out in the form of all of the results of each calibrator, each control, each known sample, and all of that data is reviewed as packaged by the Analyst and a second review process."  [*Id.* at 57].  He explained that each testing done involved two levels of analysis:  the first level is done by an analyst who runs the test while the second level of analysis is done by the supervisor who reviews "the test results to make sure the instrument is in proper working order, and test results are transcribed from the actual printout to the test results in that case file."  [*Id.* at 57-58].  Walls elaborated on the test results which are "[a] standard printout of the computer results of the analysis, of the calibrator controls and blood sample."  [*Id.* at 58].  "The Analyst reviews all the instrument printouts [and] as a result has the ability to determine if alcohol is present and how much."  [*Id.*].

The blood samples collected from Petitioner at the scene of the accident were tested on three separate occasions, once by McClure and twice by William Genaro.

Walls testified that he did not observe any of the three tests (or at least could not recall having seen them), but based on his review of the results, each of the tests appeared to have been properly conducted, the instrument properly calibrated and reading control samples properly, and the blood alcohol content was .23 (McClure's test), .225 (Genaro's first test) and .230 (Genaro's second test). Walls reiterated that the toxicologists only issued their blood alcohol reports after he had reviewed all the data put into the computer and the documentation generated therefrom.

The trial court denied the motion to suppress/exclude. Later, the defense preserved its objections to this evidence after the jury was sworn and again when the evidence was admitted at trial.

### 2.   *Trial Testimony*

Ms. Amador testified that on the evening of May 29th, she and her daughter, Giovanny, were returning from the Florida Keys where they had spent the Memorial Day weekend. They stopped on their way home to pick up Ms. Amador's son, Giovanny, from his father's house. They arrived at the house about 10:45 p.m. and the children played with their father's puppy for about ten minutes before leaving. Ms. Amador's daughter rode in the front seat of the car and Giovanny was seated in the back; all three individuals wore their seat belts. Ms. Amador turned onto SW 8th Street and then signaled and moved into the center lane. A car passed on her left side and another car passed on her right side, then she felt the impact. She did not recall anything else. She estimated her speed at the time of impact was 25 to 35 miles per hour.

That impact Ms. Amador felt was the result of a Mazda truck that slammed into the right rear of her vehicle. The speed of the truck resulted in crushing injuries to her daughter and son. Ms. Amador quickly realized that her children were likely dead as her son could not speak and her daughter was foaming at the mouth. Ms. Amador was also injured, suffering bruises, swollen ribs, and a swollen back, but she survived the collision. So did the driver of the truck. Her children did not.

There were no eyewitnesses to the accident but two witnesses who arrived immediately after the crash later identified Petitioner as the driver of the Mazda truck. One of the witnesses testified that Petitioner refused suggestions to sit down and instead walked away, repeating over and over that he had to make a phone call.

Metro-Dade Police Officers Christopher Garcia and Julio Ramos were assisting at the scene and were instructed to pick up a person nearby who was suspected of being the driver of the truck. They testified they found Petitioner crouching or kneeling in the vicinity of the accident. They took him into custody then turned him over to FHP officers. Officer Ramos testified that Petitioner volunteered that he had been visiting a friend at a party in the area.

FHP Trooper Hector Gonzalez testified that he responded to the scene and put out a BOLO for the driver of the Mazda truck. Petitioner was returned to the scene and positively identified as the driver. Trooper Gonzalez testified that Petitioner appeared to be impaired by alcohol: he had a very strong odor of alcohol on his breath, his eyes were glossy and bloodshot, and he had slow speech. The trooper requested a blood draw from Petitioner, observed the blood being drawn, then sealed the two vials

that contained Petitioner's blood samples and handed the kits over to Corporal Harry Bostic in FHP's traffic homicide division who was investigating the accident.

Corporal Bostic was on the scene immediately after the accident. He was one of three experts who testified at trial regarding the cause of the accident. He noted that there had been no tire marks made by the Mazda truck, meaning its driver (Petitioner) had not applied the brakes prior to impact. He opined that Petitioner was speeding at the time of the accident and estimated the speed to be greater than 65 mph. Corporal Bostic refused to agree with defense counsel that Ms. Amador was the sole cause of the accident based on her pulling into the center lane. He did acknowledge, though, that she likely contributed to the accident. Corporal Bostic testified that when he first encountered Petitioner at the FHP office (where he was brought after the accident but prior to being transported to the hospital), Petitioner "reeked" of alcohol.

FHP Trooper Robert Gomez testified that he observed Petitioner at the scene of the crash with the smell of alcohol on his breath. Petitioner was very unsteady on his feet and was impaired by alcohol. The trooper also stated that Petitioner later told him at the hospital that he knew what had happened – that he had blacked out and when he came to and saw the scene, he ran away.

Officer John Gilson with Miami-Dade Fire Rescue drew blood from Petitioner at the scene of the accident (pursuant to Trooper Gonzalez's request). Gilson testified that he smelled alcohol on Petitioner's breath. Miami-Dade Fire Department Captain Robin Valeriot observed Petitioner at the scene and testified that he did not exhibit symptoms consistent with having sustained a concussion.

Dr. William Fogarty testified as the state's accident reconstruction expert. He opined that the Mazda truck driven by Petitioner was moving at the speed of at least 85 miles per hour and the Oldsmobile driven by Ms. Amador was moving at 26-29 miles per hour. There was no physical evidence that the driver of the Mazda truck applied his brakes. Dr. Fogarty further opined that the collision was not caused by the Oldsmobile turning onto SW 8th Street and that the Mazda truck had caused the collision.

Rick Swope, the defense's accident reconstruction expert, opined that Ms. Amador made a right-hand turn and moved into the center lane. He said the Mazda truck was moving about 51 miles per hour when the Oldsmobile changed lanes directly in front of it, and moving between 40 and 60 miles per hour when it rear-ended the Oldsmobile. Swope concluded there was no way that the Mazda truck could be moving at 80 miles per hour as the fuel pump would cut off, according to information obtained from a representative from a Mazda dealership. Swope further testified that Petitioner could not have avoided the accident which likely occurred when Ms. Amador pulled in front of him or changed lanes in front of him.

On cross-examination, Swope admitted he did not have a degree in physics or engineering. He also admitted that he never stated at his deposition (which was conducted shortly before trial) that he had spoken with anyone from Mazda before formulating his opinions. Swope did not dispute that momentum is never lost in the course of a crash or that energy can be lost.

On rebuttal, Dr. Fogarty noted that a representative at Mazda indicated to him that a 1994 Mazda V-6, 3-liter truck could travel at a maximum of 95 to 97 miles per

hour. Dr. Fogarty further noted that the friction factor as well as the laws of momentum and conservation of energy did not support Swope's opinion that the Mazda truck was traveling at 51 miles per hour while the Oldsmobile was moving at 15 miles per hour.

Dr. Andrew Todd was the attending physician in the emergency room at Jackson Memorial Hospital on the night of the crash and treated Petitioner. According to Dr. Todd, toxicology reports for blood drawn at the hospital revealed that Petitioner's blood alcohol level was .272. Dr. Todd further noted that the medical records did not indicate that Petitioner had suffered a loss of consciousness and that a concussion involves some type of neurological impairment or loss of consciousness.

Chip Walls testified consistently with the testimony he gave at the pretrial hearing. Among other testimony, he described his responsibilities as director of the forensic lab; his educational and professional background including his prior testimony as an expert in the field; how alcohol affects human beings; the instrument his lab used to analyze blood samples for alcohol content (the gas chromatograph); and the standard procedures employed in his lab including calibration of the instrument, use of control materials to ensure accuracy, and the cross-verification to arrive at final results.

Walls also testified that he no longer does the bench work for blood alcohol tests but that he directly supervised McClure and Genaro who did perform the tests. He described, again consistent with his pretrial testimony, how Petitioner's blood samples were analyzed and his role in ensuring the accuracy of the testing process, including his review of the testing protocol, instrument calibration, control materials, and

computer-generated printout of test results.  He reiterated the fact that each time Petitioner's blood was tested, as per standard lab protocol, he conducted a second, independent review, and that final test results were only issued following his review.[9] Finally, and again consistent with the pretrial testimony, he testified that the results of all three tests performed on Petitioner's blood by his lab revealed a blood alcohol content of nearly three times the legal limit.[10]

During closing argument, the prosecutor made two comments that are relevant to Petitioner's pending habeas claims.  During her initial closing, the prosecutor said:

---

[9]    For instance, when asked whether he had reviewed all the paperwork generated when McClure ran the first blood sample through the gas chromatograph instrument, Walls told the jury:

> As standard practice all the lab results that go out of the laboratory, no matter who does it, another analyst in this particular case, myself[,] will review all the test results and this will include the calibration in the [gas chromatograph], the property receipt form that [] came with the sample and all the test results of this particular blood tube itself, the control material that was also run in conjunction with the analysis and that is all reviewed first by the analyst and then by myself and then reports would be generated.

> * * *

> I reviewed the data for the calibrations and control for this particular case, blood results after [McClure] had reviewed it and then issued the information to basically put into the computer and the report was generated.

[D.E. 18, T. Vol. 5 at 720, 722].

[10]    Walls testified that each time a blood sample was tested, two different portions of blood were taken from the blood specimen and each portion was tested twice, for a total of four results.  The testing by McClure reflected .241, .242, and .243 grams of alcohol per deciliter; the first test performed by Genaro reflected .225, .225, .226, and .225; and the second test by Genaro reflected .230, .230, .230, and .231.

PROSECUTOR:        Well, there was the death stipulation that these two children are no longer with us, and will never again go to school, and will never be in the Keys with their parents, and will never spend the weekend playing with puppies.

DEFENSE COUNSEL:    I respectfully object.

THE COURT:        Move on.

[D.E. 18, T. Vol. 8 (Trial Transcript) at 1188].  Then, in rebuttal closing, the prosecutor said:

PROSECUTOR:        I suppose a person that gets as drunk as the Defendant did, and drives as fast as he did, maybe it was a Russian roulette game.

If it wasn't Giovanny and Yanick, maybe somebody else.

DEFENSE COUNSEL:    Objection.  Move for a curative instruction.

THE COURT:        Argument.  It's the jury's recollection.

[*Id.* at 1278-79].

After deliberating, the jury returned a verdict of guilty on two counts of DUI manslaughter, one count of vehicular homicide, and one count of leaving the scene of an accident involving property damage.

## II.   ANALYSIS

Petitioner moves to vacate his convictions and sentences on three grounds.  He first claims his constitutional right to a fair and impartial trial was violated when the trial court allowed prosecutorial comments during closing argument, over defense objection, that appealed to the emotions and fears of the jury.

Next, Petitioner alleges the trial court erred in denying his motion to exclude the results of his blood alcohol tests in violation of the Confrontation Clause and as not being scientifically reliable. Specifically, Petitioner contends the trial court violated his Confrontation Clause rights by admitting the results of blood alcohol tests not through the testimony of the analysts who actually conducted the tests but through their supervisor who was not certified to conduct the tests and who was not present when the tests were conducted. Petitioner claims that the trial court's ruling denied him meaningful cross-examination of the witnesses testifying against him, i.e., the technicians who actually conducted the tests.

Finally, Petitioner argues that the trial court erred in overruling defense counsel's objection and allowing the state's accident reconstruction expert, Dr. Fogarty, to testify that, "to the exclusion of all reasonable doubt," Petitioner had been traveling at a speed of 85 miles per hour at the time of impact. Petitioner claims that this testimony concerned the critical question of whether or not he caused the accident. It was opinion testimony that went to the ultimate issue for the jury, his guilt, and therefore should not have been allowed.

Before we can reach the merits of Petitioner's claims, however, we must first determine whether he has met certain procedural hurdles.

## A.    *Exhaustion of State Law Remedies*

Before a petitioner can bring a habeas petition in federal court, he first must have exhausted his claims in state court. *See, e.g., Anderson v. Harless*, 459 U.S. 4 (1982). "Exhaustion" means that a petitioner has "fairly apprised the highest court of his state with the appropriate jurisdiction of the federal rights which allegedly were

violated." *Upshaw v. Singletary*, 70 F.3d 576, 578 (11th Cir. 1995) (citing *Picard v. Connor*, 404 U.S. 270, 276 (1971)).  In Florida, in a non-capital case such as this one, the petitioner must have apprised a district court of appeal.  *Id.* at 579; *Williams v. McNeil*, No. 08-62078-CIV, 2009 WL 4891954, at *3 (S.D. Fla. Dec. 16, 2009).

In addition, the petitioner must have presented the same claims to the state court that he is asserting in his § 2254 petition.  *Anderson*, 459 U.S. at 6 ("[A] federal habeas petitioner [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim.") (quoting *Picard*, 404 U.S. at 276-77).  As the Eleventh Circuit summarized:

> Habeas petitioners generally cannot raise claims in federal court that were not first exhausted in state court.  To properly exhaust a claim, "the petitioner must afford the State a full and fair opportunity to address and resolve the claim on the merits."  It is not sufficient merely that the federal habeas petitioner has been through the state courts, nor is it sufficient that all the facts necessary to support the claim were before the state courts or that a somewhat similar state-law claim was made.  The petitioner must present his claims to the state courts such that they are permitted the "opportunity to apply controlling legal principles to the facts bearing upon (his) constitutional claim."

*Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1343-44 (11th Cir. 2004) (internal citations omitted).  Moreover, the claims must have been presented to the state court in a procedurally correct manner.  *Upshaw*, 70 F.3d at 579 (state court's denial of a claim based on a procedural violation generally bars the federal court from considering the claim, where the violation provided an "adequate and independent" ground for denial of the claim).

In our case, Petitioner raised each of the three issues presented in his federal habeas petition in the trial court and on direct appeal.  As the state concedes, he has

exhausted his state remedies and is not procedurally barred from federal habeas review.

### B.   *Statute of Limitations*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations on petitions for writ of habeas corpus filed by state prisoners.  28 U.S.C. § 2254(d).[11]  A state prisoner must file a petition for writ of habeas corpus within one year of the date his judgment becomes final after direct appeal or the time for seeking such review has expired.  28 U.S.C. § 2244(d)(1)(A); *see, e.g., Ousley v. Sec'y, Dep't of Corr.*, 269 Fed. Appx. 884, 885 (11th Cir. 2008).  When the petitioner has pursued a direct appeal of his conviction and sentence, the judgment becomes final for purposes of the AEDPA when the ninety-day period to seek *certiorari* review in the United States Supreme Court has expired or when the Court has ruled on such a *certiorari* petition.  *Nix v. Sec'y, Dep't of Corr.*, 393 F.3d 1235, 1236-37 (11th

---

[11]    The statute provides that the limitations period shall run from the latest of –

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Cir. 2004) (Florida state prisoner's conviction became final ninety days after the state appellate court affirmed his conviction and sentence, during which time the prisoner could have sought *certiorari* review in the U.S. Supreme Court); *Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002) (conviction became final ninety days after the judgment by the state supreme court on discretionary review was issued, within which *certiorari* petition could have been filed); *Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006) (ninety-day period for seeking *certiorari* runs from the Florida district court's entry of judgment on appeal, not from the issuance of the mandate); *Hollinger v. Sec'y, Dep't of Corr.*, 334 Fed. Appx. 302, at *1 (11th Cir. 2009) (prisoner's conviction became final ninety days after rehearing on direct appeal was denied).

Once the statute of limitations begins to run, the limitations period can be tolled through statutory tolling or equitable tolling. *See, e.g., Brown v. Barrow*, 512 F.3d 1304, 1307 (11th Cir. 2008). The AEDPA statutory tolling provision provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."   28 U.S.C. § 2244(d)(2); *see, e.g., Lawrence v. Florida*, 549 U.S. 327, 331-32 (2007) (one-year statute of limitations for seeking federal habeas corpus relief from state court judgment was tolled while state courts reviewed the denial of state post-conviction relief; AEDPA clock began running again upon issuance of the mandate by the appellate court); *McCloud v. Hooks*, 560 F.3d 1223, 1227 (11th Cir. 2009); *Webster v. Moore*, 199 F.3d 1256, 1257 (11th Cir. 2000).  Meanwhile, the doctrine of equitable tolling applies only

when a petitioner shows "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, No. 09-5327, 2010 WL 2346549, at * 12 (U.S. June 14, 2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

As the state concedes, the pending habeas petition was timely filed. Petitioner's conviction became final for purposes of the AEDPA statute of limitations on June 15, 2004, ninety days after the district court of appeal issued its opinion (affirming his conviction) on direct appeal on March 17, 2004.[12] His 3.850 motion was filed on September 23, 2004,[13] which stopped the AEDPA clock. At that point, 100 days had already run. The 3.850 motion was subsequently denied by the trial court; that ruling was affirmed on appeal; and the post-conviction proceeding became final on April 13, 2007 with the issuance of the Mandate by the district court of appeal.

However, the "resubmitted" post-conviction motion was filed on April 9, 2007, a few days before the Mandate on the first 3.850 motion was issued. The "resubmitted" motion raised claims of ineffective assistance relative to post-conviction counsel's

---

[12]    The state alternatively asserts that the conviction became final on May 19, 2004, thirty days after Petitioner was re-sentenced on April 19, 2004, after dismissal of the two counts of vehicular homicide. *See Ferreira v. Sec'y, Dep't of Corr.*, 494 F.3d 1286, 1293 (11th Cir. 2007) (holding that the "AEDPA's statute of limitations begins to run from the date both the conviction *and* the sentence the petitioner is serving at the time he files his application become final because judgment is based on both the conviction and the sentence.") (emphasis in original). We need not pick a date because under either scenario, the petition was timely-filed.

[13]    In accordance with the "mailbox rule," the petition was deemed filed in federal court on the date it was delivered to prison authorities for mailing, which absent evidence to the contrary is presumed to be the date it was signed. *McCloud*, 560 F.3d at 1227.

performance at the evidentiary hearing conducted on the post-conviction motion, not at trial. This "resubmitted" motion was a "properly filed application for State post-conviction or other collateral review" under AEDPA, meaning the statute of limitations remained tolled while the "resubmitted" motion remained pending. The motion eventually was denied; appealed; and the denial affirmed by the district court of appeal on March 5, 2008. The Mandate in that appeal was issued March 24, 2008, and thus that is the date the "resubmitted" post-conviction proceeding became final.

The petition now before us was filed on March 18, 2008 (under the mailbox rule). As sufficient time remained on the AEDPA statute of limitations clock, the petition was timely-filed.

### C.   *Federal Habeas Corpus Relief*

The AEDPA provides that a state prisoner is entitled to federal habeas corpus relief only under limited circumstances. Petitioner is not entitled to relief in this court unless he can demonstrate that the state court's determination on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1) - (2).

The Supreme Court has explained what these provisions of AEDPA mean as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following

> two conditions is satisfied – the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.   Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

A decision is "contrary to" clearly established federal law "if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case." *Rutherford v. Crosby*, 385 F.3d 1300, 1306 (11th Cir. 2004) (citing *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001)).  "The Supreme Court has held that § 2254(d)(1) imposes a highly deferential standard for evaluating state-court rulings, a standard which demands that state-court decisions be given the benefit of the doubt.  More than once the Supreme Court has instructed lower federal courts that the statute requires more than mere error, and more even than clear error, before federal habeas relief may be issued." *Id.* at 1306-1307 (internal citations omitted).

"Unless a state court decision is directly contrary to Supreme Court case law," a federal court must review state court findings of fact and conclusions of law for

reasonableness. *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1321 (11th Cir. 2002). A federal court reviews *de novo* whether the state court's findings and conclusions are reasonable. *Id.* It is the habeas petitioner who carries the burden of establishing his right to federal habeas relief. *See Romine v. Head*, 253 F.3d 1349, 1357 (11th Cir. 2001).

With respect to the second basis for relief under AEDPA – an "unreasonable determination of the facts in light of the evidence presented in the state court proceedings" – the Supreme Court has rejected such claims where there is evidence in the record that supports the state court's determination of the facts. *See, e.g., Schriro v. Landrigan*, 550 U.S. 465, 475-477 (2007); *Rice v. Collins*, 546 U.S. 333, 338-42 (2006). If "[t]he parties do not dispute the underlying facts, ... respondent is ... entitled to habeas relief *only* if he can meet one of the two bases for relief provided in § 2254(d)(1)." *Price v. Vincent*, 538 U.S. 634, 639-40 (2003).

### 1. *Prosecutorial Comments*

Petitioner argues that the prosecutor's comments, first that the children would never again play with their puppies, go to school or travel with their parents, and second, that if it were not these children then Petitioner's actions would have affected another family, were calculated to "inflame the sensibilities of the jury and appeal to them as the 'conscience of the community.'" [D.E. 2 at 11]. He claims these comments were particularly prejudicial and harmful because the government's case against him hinged on the accident reconstruction experts' disagreement as to how the accident took place. Two experts testified that the accident would not have happened if Ms.

Amador had not violated the right-of-way.  Another opined that Petitioner was the sole cause of the accident.  The case was not an open-and-shut case of DUI manslaughter, Petitioner argues, and admission of the aforementioned improper comments affected his substantial rights.  He complains that because no curative instruction was given and, in fact, the trial court overruled or ignored defense counsel's objections, jurors were allowed to believe that the prosecutorial comments were essentially arguments they could validly consider when deciding the case.

The clearly-established federal standard regarding whether to grant a new trial based on improper prosecutorial conduct is found in *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-48 (1974); *accord Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Pursuant to the *Donnelly* standard, Petitioner is entitled to relief only if the prosecutor's comments were so egregious in the context of the entire trial that they rendered his trial fundamentally unfair.  It is not enough if the comments are "undesirable or even universally condemned." *Darden*, 477 U.S. at 181.  "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (internal citation omitted).  We must keep in mind that our review is "the narrow one of due process, and not the broad exercise of supervisory power that [we] would possess in regard to [our] own trial court." *Donnelly*, 416 U.S. at 642 (citation omitted).  That is important because "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" *Id.* (citation omitted).

Thus in *Darden*, even though the prosecutors' closing argument was undoubtedly improper and "deserve[d] the condemnation it ha[d] received from every court to review it," 477 U.S. at 179-80,[14] the Court concluded that the comments did not deprive the defendant of a fair trial.  *Id.* at 181.  The Court reached this conclusion for a variety of reasons:  the prosecutors had not manipulated or misstated the evidence; had not implicated other rights of the defendant such as his right to remain silent or right to counsel; had responded in large part to comments the defense had made in its argument; the trial court had reminded the jurors that their decision was to be based on the evidence alone and that arguments by counsel were not evidence; the evidence weighed heavily against the defendant; and defense counsel had argued effectively in final rebuttal closing.  *Id.* at 181-83.  Hence the Court determined that the improper comments, when placed in the context of the facts and circumstances of the case, did not render the trial unfair and thus did not constitute constitutional error.  *Id.* at 183 n.15.

In our case, the propriety of the prosecutor's comments were raised on direct appeal.  In affirming the convictions below, the Third District Court of Appeal concluded that

> [t]he prosecutor's comments, although bordering on inappropriate, were not of such a nature as to deprive Galiana of a fair trial, did not materially contribute to his conviction, and were not so fundamentally tainted or inflammatory that a new trial is warranted.  *See Lopez v. State*,

---

[14]     For instance, the prosecutors in *Darden* said that the death penalty would be the only guarantee against future similar acts (murder, robbery, and assault with the intent to kill) by the defendant; incorporated the defense counsel's use of the word "animal" when referring to the defendant; and made several offensive comments that reflected an emotional reaction to the case.  477 U.S. at 180-81 and n. 9-12.

> 555 So. 2d 1298 (Fla. 3d DCA 1990).  In context of the entire trial and record on appeal, the comments, made in closing, were harmless and the trial court did not abuse its discretion by denying Galiana's motion for mistrial.

*Galiana*, 868 So. 2d at 1219 (footnote omitted).  We concur with the state appellate court's conclusion that the comments did not deprive Petitioner of a fair trial.

The state suggests that the prosecutor was merely summarizing the evidence when she said the children would never again play with puppies, go to school, or travel with their parents, in light of evidence showing that the family was on its way home from the Keys and had stopped at the children's father's house to play with their puppy shortly before the accident occurred.  According to the state, so long as argument is predicated on the evidence, a prosecutor should be given wide latitude in arguing to the jury, including all logical inferences that can be derived therefrom.  *See, e.g., United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978) (in closing argument, counsel may state his or her contention as to the conclusion which the jury should draw from the evidence).  Moreover, the state claims that defense counsel made a similar type argument when he argued that he wished he were not in court at that time for the sake of the two children, so to that extent the prosecutor's comments were invited by the defense.

We are not willing to fully embrace the state's position that the remarks about the children were a simple summation of the evidence.  Arguably they could be seen as an appeal to the jurors' emotions and as such would be improper.  *See, e.g., Lewis v. State*, 780 So. 2d 125, 129 (Fla. 3d DCA 2001) (prosecutorial appeals for sympathy from the jury are improper).

As for the other objected-to prosecutorial comment, as to Petitioner's actions affecting *some* family if not the Amador family, the state concedes the comment might have been "a little overboard," but contends it was an isolated improper comment that should be deemed harmless.

But even if *in toto* the prosecutor's comments bordered on the inappropriate, as the state appellate court concluded, they were not sufficiently egregious to inflame the jurors or affect the fundamental fairness of Petitioner's trial.  The comments made are quite mild when juxtaposed against those made by the prosecutor in *Darden*, yet the Supreme Court ruled that the statements there were not prejudicial enough to entitle the defendant to habeas relief because they did not render the defendant's trial fundamentally unfair.  477 U.S. at 182-83.

Petitioner attempts to distinguish our case from *Darden* by asserting that in *Darden*, the weight of the evidence against the defendant was "heavy" and the objectionable comments were to a great extent invited by defense counsel.  [D.E. 21 at 2].  We acknowledge that "invited error" is not a factor in our case and the evidence against the defendant in *Darden* – "overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges," 477 U.S. at 182 – was much "heavier" than in our case.  But the evidence here does amply support the guilty verdict and is "heavier" than Petitioner is willing to admit.

The jury heard that Petitioner was the driver of the truck that crashed into Amador's vehicle, ran away from the scene of the accident, and was hiding when authorities apprehended him. Corporal Bostic, Troopers Gonzalez and Gomez, Captain

Valeriot, and Miami-Dade Fire Rescue Officer Gilson all testified that Petitioner smelled of alcohol and/or had glassy, bloodshot eyes consistent with intoxication by alcohol.  There was testimony from some of the officers that Petitioner's speech was slow and he was unsteady on his feet and appeared to be under the influence of alcohol.  He had a blood alcohol level of .225 or .230 based on tests of his blood taken at the scene of the accident, and a .272 blood alcohol level based on the test conducted at the hospital shortly thereafter.  Valeriot testified that Petitioner did not exhibit behavior consistent with having sustained a concussion and Dr. Todd noted that the medical records did not indicate Defendant had experienced a loss of consciousness. Ms. Amador testified that she was driving between 25-35 miles per hour at impact. Corporal Bostic opined that Petitioner was exceeding the speed limit while Dr. Fogarty opined that Petitioner's truck was traveling at approximately 85 miles per hour at impact.  Both Dr. Fogarty and Corporal Bostic reported there were no skid marks for the Mazda truck, which meant that Petitioner never applied his brakes.

All of these facts are highly damaging evidence from which the jury could easily determine that Petitioner recklessly caused the accident and, therefore, was guilty of the offenses for which he was ultimately convicted.  The jury also heard testimony from Corporal Bostic and Rick Swope that Petitioner was not the sole cause of the accident, that he was driving slower than Dr. Fogarty had opined, and it was Ms. Amador's act of pulling into the center lane in front of Petitioner that caused in whole or in part the accident.  The jury considered this evidence but obviously rejected it.  We note that the improper prosecutorial comments had nothing to do with the issue of whose fault the

accident was, the area Petitioner claims was so hotly disputed and is of pivotal concern now.

In addition to ample evidence of guilt, some of the other factors that in *Darden* mitigated against a finding that the highly improper prosecutorial comments undermined the fairness of the trial exist in our case.  Here, as in *Darden*, the prosecutor did not manipulate or misstate the evidence or implicate other rights of Petitioner; and the trial court instructed the jurors on several occasions that arguments by counsel were not evidence and could not be relied on to decide the case. We fail to see how the borderline-inappropriate prosecutorial comments made in closing, in the context of the entire trial, were so egregious and so infected the trial with unfairness as to make Petitioner's conviction a violation of due process.

In support of his claim that this case was close and prosecutorial misconduct deprived him of a fair trial, Petitioner cites *Lewis v. State*, 780 So. 2d 125, 131 (Fla. 3d DCA 2001), "a close case where the credibility of the state's witnesses was absolutely critical."  In reversing the defendant's convictions and sentences, the state appellate court concluded that

> the prosecutor's bolstering of the police officers' testimony, which was critical to establishing the voluntariness of the [defendant's] confession, the appeals to sympathy and the repeated attacks on defense counsel's integrity, including the suggestion that he had suborned defendant's perjury and improperly cross-examined the state's only eye witness, deprived the defendant of a fair trial.

*Id.*  For the reasons stated above in connection with *Darden*, we find our case is similarly distinguishable from *Lewis* which had numerous and "grossly improper comments" and close evidence.  Neither of those factors exist in our case.

We reach the same conclusion with regard to two other cases Petitioner cites for the general proposition that closing argument must not be used to inject elements of emotion and fear into the jurors' deliberations so that the verdict reflects an emotional response to a crime or defendant rather than a logical analysis of the evidence in light of the applicable law. In both *Garron v. State*, 528 So. 2d 353, 359 (Fla. 1988), and *Bertoletti v. State*, 476 So. 2d 130, 134 (Fla. 1985), the state supreme court found prosecutorial misconduct during closing argument in the penalty phase of a death case. In *Bertoletti*, the court found the comments on the defendant's right to remain silent; a "Golden Rule" type argument that invited the jury to imagine the victim's final pain, terror, and defenselessness; and the prosecutor's urging the jury to consider the message its verdict would send to the community at large, all highly improper, yet not sufficiently outrageous as to taint the validity of the jury's recommendation of death in light of the evidence of aggravation presented. 476 So. 2d at 132-33. In *Garron*, though, the court determined a mistrial should have been granted given the egregious conduct of the prosecutor. 528 So. 2d at 358-60. "In his determination to assure that appellant was sentenced to death, this prosecutor acted in such a way as to render the whole proceeding meaningless." *Id.* The comments in both *Bertoletti* and *Garron* were far more inflammatory than the comments made in our case, distinguishing those cases from ours.

In any event, as already stated, we do not think that the jury could have returned a verdict based solely on emotion in reliance on two minor improper comments made during closing argument. The trial court instructed the jurors several

times during the course of the trial that they could not base their decision on what the attorneys said.  During initial instructions to the jury, the court explained that "[o]pening statements are the attorneys' versions of what they feel the evidence in the case will show" and "[w]hat the lawyers say is not evidence and you are not to consider it as such." [D.E. 18, T. Vol. 2 at 269].  Later, just before closing argument, the trial court reiterated this point by reminding jurors that "closing statement is the attorney's version or what they believe the evidence has shown" and by repeating several times that what the attorneys said was not evidence and should not be considered as such. [*Id.*, Vol. 8 at 1176-77].

The court also instructed the jurors that "[t]his case must not be decided for or against anyone because you feel sorry for anyone, or are angry at anyone."  [*Id.* at 1296].  Finally, the court reminded the jurors that their verdict "should not be influenced by feelings of prejudice, bias or sympathy.  Your verdict must be based on the evidence, and on the law contained in these instructions." [*Id.* at 1297].

These instructions militate against our finding that improper prosecutorial conduct had a substantial and injurious effect or influence on the verdict.  It must be presumed that the jury followed the court's instructions, *see, e.g., Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and *Sutton v. State*, 718 So. 2d 215, 216 (Fla. 1st DCA 1998), and any prejudice created by the prosecutor's remarks was rectified.

In sum, we do not find that the borderline-inappropriate prosecutorial comments were so egregious and so infected the trial with unfairness as to make Petitioner's conviction a violation of due process.  Instead, we find that Petitioner has failed to

show that the state court proceedings were contrary to clearly established federal law or that the state court unreasonably applied established Supreme Court precedent to the facts in Petitioner's case. Consequently, we recommend that his petition for habeas relief on the ground of prosecutorial misconduct be denied.

### 2. Admissibility of Supervisor's Testimony Regarding Blood Alcohol Tests Conducted by Others

Petitioner next argues that the trial court violated his rights under the Confrontation Clause when it admitted over objection the results of his blood alcohol tests, not through the testimony of the analysts who conducted the blood tests but through their supervisor who was not present when the tests were conducted. Petitioner asserts that the trial court's ruling denied him the opportunity to face the technicians who "accused" him of having a blood alcohol level well over the legal limit and who thus bore witness against him in connection with the criminal charges against him.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This "bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42 (2004). At the time Petitioner was convicted in 2002, the test for determining whether admission of a hearsay statement against a criminal defendant violated his right to confront the witness was controlled by *Ohio v. Roberts*, 448 U.S. 56 (1980). In 2004, however, just days before Petitioner's conviction became final, the law regarding Confrontation

Clause rights changed substantially when the United States Supreme Court decided *Crawford* and overruled *Roberts* in the process.[15]

In *Crawford*, the issue before the Court concerned a wife's tape-recorded statement to the police regarding an incident in which the defendant, her husband, allegedly stabbed a victim. 541 U.S. at 38. At trial, the defendant claimed self-defense. *Id.* at 40. The wife did not testify pursuant to a state marital privilege so the state introduced her tape-recorded statement as evidence that the stabbing was not in self-defense. *Id*. The defendant, of course, could not cross-examine the statement. The Supreme Court held that the Confrontation Clause guarantees a defendant's right to confront those who "bear testimony" against him. *Id.* at 51. Thus, the testimony of a witness who does not appear at trial is inadmissible against a defendant "unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 54.

Clearly, not every hearsay statement implicates the Confrontation Clause. "Only [testimonial statements] cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006). "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the

---

[15]     Under *Roberts*, an unavailable witness's statement could be admitted if the statement bore "adequate 'indicia of reliability.'" 448 U.S. at 66. Reliability could be inferred without more, the Court explained, if the evidence fell "within a firmly rooted hearsay exception" or if it bore "particularized guarantees of trustworthiness." *Id.* But the Court in *Crawford* dispensed with the *Roberts*' reliability analysis because it strayed from the historical underpinnings of the Confrontation Clause. *Crawford*, 541 U.S. at 60.

Confrontation Clause." *Id.*  Although the Court in *Crawford* intentionally declined to set forth a comprehensive definition of "testimonial," it said the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68.

Last year the Supreme Court again addressed the issue of testimonial statements under the Confrontation Clause.  In *Melendez-Diaz v. Massachusetts*, __ U.S. __, 129 S. Ct. 2527, 2531-32 (2009), the statements were "certificates of analysis" that reported the results of a forensic analysis performed on a substance seized from the defendant.  At trial the government introduced into evidence the certificates which showed that the substance was cocaine of a certain quantity, in lieu of any live, in-court testimony on the issue.  *Id.*

The Supreme Court readily concluded that these affidavits were "testimonial statements" because they were "declaration[s] of fact written down and sworn to by the declarant before an officer authorized to administer oaths" and "incontrovertibly a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 2532 (internal citations omitted).  The particular fact to be proved was that the substance found in the defendant's possession was cocaine.  *Id.*  The Court concluded that the affidavits were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'" *Id.* (internal citation omitted).  Moreover, the sole purpose of the affidavits was for use at trial, to provide prima facie evidence of the composition, quality, and net weight of the analyzed substance.  *Id.*

Stating that the case involved "little more than the application of our holding in *Crawford*[,]" the Court held that the forensic analysts who had prepared the affidavits were "witnesses" for purposes of the Sixth Amendment and subject to confrontation by the defendant." *Id.* at 2532, 2542. Absent a showing that the analysts were unavailable to testify at trial and that the defendant had a prior opportunity to cross-examine them, the affidavits were inadmissible against him. *Id.* at 2532.

Petitioner argues that his case is controlled by *Crawford* and *Melendez-Diaz*.[16] He claims that McClure and Genaro's conclusions about the amount of alcohol in his blood are testimonial in the same way that the affidavits prepared by the forensic analysts in *Melendez-Diaz* were. But McClure and Genaro did not testify at his trial, and the supervisor who did was not present when the tests were conducted. Consequently, Petitioner claims, his right to confront the witnesses who actually bore testimony against him was thwarted.

For purposes of federal habeas review, "clearly established federal law" consists of the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 365. The relevant law

---

[16] Shortly after *Melendez-Diaz* was decided, we ordered the parties to brief the following issues: the effect/relevance of *Melendez-Diaz* on the instant case, including whether or not a supervisor's testimony as to lab results conducted in his laboratory satisfies the defendant's right to confrontation as defined in *Crawford*; the effect/relevance of *State v. Johnson*, 982 So. 2d 672 (Fla. 2008) on the instant case; the issue of retroactive application of law pursuant to a change thereof on the pending matters, if any, including whether this Court should regard the same as a procedural or substantive matter; and what the record discloses as to the basis of unavailability at trial of the second lab technician, Genaro. [D.E. 22].

is the federal law that existed on the date a petitioner's conviction became final.  *Gary v. Hall*, 558 F.3d 1229, 1254 (11th Cir. 2009).  "A Supreme Court decision, which is not dictated by precedent or is not made retroactive to cases on collateral review, handed down after the petitioner's conviction becomes final does not control the disposition of the petitioner's habeas proceeding."  *Id.* (citing *Newland v. Hall*, 527 F.3d 1162, 1196-1201 (11th Cir. 2008)).

Petitioner's conviction became final on March 17, 2004.  As *Crawford* was decided on March 8, 2004, it was law at the time Petitioner's conviction became final and as such applies here.  The initial question before us is whether *Melendez-Diaz*, which was decided after Petitioner's conviction became final but while his federal habeas petition was pending, applies retroactively to his case.  *See, e.g., Vega v. Walsh*, No. 06-CV-6492 (ARR)(JO), 2010 WL 1685819, at *9 (E.D. N.Y. April 22, 2010) (Orenstein, Magistrate J.) (analyzing the retroactivity of *Melendez-Diaz* when the petition for habeas relief, which asserted erroneous admission of a medical examiner's testimony about the results of an autopsy she did not perform, was pending in federal court at the time the decision was handed down).

We agree with the rationale articulated in *Vega* and other decisions that have already addressed this issue and hold that *Melendez-Diaz* does not apply retroactively in this case.  *Id.* at *9 - *10 (*Melendez-Diaz* does not apply retroactively because it was not in existence at the time the petitioner's conviction became final; although the majority in *Melendez-Diaz* characterized the decision as "little more than the application of our holding in *Crawford*[]," 129 S. Ct. at 2542, the ruling regarding the

admission of scientific evidence was by no means apparent to all reasonable jurists and therefore the decision announced a new rule; the rule was procedural not substantive, given that the Confrontation Clause is a procedural rather than a substantive guarantee; and the rule was not a "watershed" rule that implicated "the fundamental fairness and accuracy of the criminal proceeding"); *see also, e.g., Newsome v. Superintendent*, No. 3:09 CV 92 JM, 2010 WL 597943, at *3 (N.D. Ind. Feb. 17, 2010) (*Melendez-Diaz* does not apply retroactively to cases on collateral review); *Silva v. Warden, New Hampshire State Prison*, No. 09-cv-388-JD, 2010 WL 987026, at *2, *6 (March 17, 2010) (same; recognizing that after *Crawford* and before *Melendez-Diaz*, the question of whether the results of various testing and recording were admissible or violated the Confrontation Clause under *Crawford* was answered differently by different courts, i.e., "outside of the area of core testimonial statements to law enforcement officers, the courts varied widely in their interpretations of *Crawford* and *Davis*. . . ."); *United States v. Alexander*, No. 2:04-cr-71, 2010 WL 404072, at *5 (N.D. Ind. Jan. 25, 2010); *Larkin v. Yates*, No. CV 09-2034-DSF (CT), 2009 WL 2049991, at *2 (C.D. Cal. July 9, 2009).

Thus, *Crawford* is the benchmark Supreme Court case against which to assess Petitioner's claim for habeas relief based on a Confrontation Clause violation. *Crawford* dealt with out-of-court taped statements.  It was not reasonably foreseeable, though, that its holding would extend to live testimony by an expert about blood alcohol results based on tests performed by analysts he supervised where the testing

procedures and results were independently reviewed, evaluated, and confirmed by him.

Petitioner claims that Walls was merely a "conduit for Genaro and McClure's test results" and did nothing more than read their test results and testify that he felt the standard practices of the lab which they employed were reliable. [D.E. 29 at 10]. But the record here does not bear out the contention that Walls merely summarized and ratified out-of-court statements and opinions of others.

Walls testified that blood alcohol testing in his lab always involved a two-step review process. Following lab protocol, McClure and Genaro performed their tests by running samples of Petitioner's blood through the gas chromatograph. The results from the tests were printed out and included all the information regarding calibration, controls, and the particular blood sample. All the information was independently reviewed by Walls during a second review. Once he was satisfied that all established lab protocols had been followed and the gas chromatograph was accurately reading the sample, the test results were transcribed from the printout and placed in the case file. Walls explained that he could determine, from the gas chromatograph-generated computer printout, whether and how much alcohol was present in the blood. Walls reiterated that Petitioner's blood alcohol reports were issued only *after* he had completed an independent assessment of all the information provided in connection with each test.

This record reflects that Walls did more than merely summarize and repeat the conclusions of McClure and Genaro. He conducted his own independent assessment

of the tests performed on Petitioner's blood.  He interpreted the raw data generated by the gas chromatograph and reached an independent opinion about the alcohol content of Petitioner's blood based on that data, just as McClure and Genaro had done.  Results were not finalized until Walls had completed his assessment and confirmed the results.

Persuasive authority exists that the Confrontation Clause does not require an expert to have performed the actual lab work to permissibly testify with regard to conclusions he or she has drawn from the results of that lab work.  In *United States v. Washington*, 498 F.3d 225 (4th Cir. 2007), the Fourth Circuit concluded there had been no Confrontation Clause violation when the director of a forensic lab reviewed the data from tests conducted by lab technicians under his supervision and issued a report based on that data, then later testified at trial with regard to his conclusions.

The court determined that the technicians had not made statements as to the content of the defendant's blood sample:

> The most the technicians could have said was that the *printed data* from their [gas] chromatograph machines showed that the blood contained PCP and alcohol.  The machine printout is the only source of the statement, and no *person* viewed a blood sample and concluded that it contained PCP and alcohol.  Yet, the very same data that would have permitted the lab technicians to say that the blood contained PCP and alcohol were also seen and interpreted by Dr. Levine [the director of the lab].
>
> Moreover, those data were the only basis upon which Dr. Levine stated in court that the blood sample contained PCP and alcohol.  In short, the inculpating "statement" - that [the defendant's] blood sample contained PCP and alcohol - was made by the machine on printed sheets, which were given to Dr. Levine.  The technicians could neither have affirmed or denied *independently* that the blood contained PCP and alcohol because all the technicians could do was to refer to the raw data printed out by the machine.  Thus, the statements to which Dr. Levine testified in court - the blood sample contained PCP and alcohol - did not come from the

out-of-court technicians, and so there was no violation of the
Confrontation Clause.

*Id.* at 229-230 (emphasis in original).

The court thus rejected the characterization of the raw data generated by the
chromatograph as statements of the technicians who operated the machines. *Id.* at
230. "Only the machine, through its diagnostic and technical process, could provide
facts about the chemical composition of [the defendant's] blood. Accordingly, the raw
data generated by the machines were not the statements of technicians." *Id.* And, as
the raw data were not hearsay statements ("nothing 'said' by a machine . . . is
hearsay", *id.* at 231 (citation omitted)), no out-of-court statement implicating the
Confrontation Clause had been admitted through the testimony of the lab director.
*Id.*[17]

Similarly, in *United States v. Moon*, 512 F.2d 359, 362 (7th Cir. 2008), the
Seventh Circuit later held that "the Confrontation Clause does not forbid the use of
raw data produced by scientific instruments, though the interpretation *of* those data
may be testimonial." (emphasis in original). In that case, the testimony at issue came
from a chemist who concluded that the substance seized from the defendant was

---

[17]    The court explained that any concerns about the reliability of the
chromatograph could be addressed through the process of authentication, not by
hearsay or a Confrontation Clause analysis. *Id.* at 231. *See also United States v.
Lamons*, 532 F.3d 1251, 1261, 1262-65 (11th Cir. 2008) (citing with approval *Moon* and
*Washington*, and holding that a compact disc of data collected from telephone calls
made to an airline's corporate toll-free number and a report created from that CD were
statements of machines, not statements of persons, and therefore not "statements"
within the meaning of the Confrontation Clause and Fed. R. Evid. 801(a); further
noting that the best way "to advance the truth-seeking process with respect to such
statements is not through cross-examination of the machine operator, but through the
process of authentication as provided for" in Fed. R. Evid. 901(b)(9)).

cocaine. *Id.* at 360-61. The chemist, testifying as an expert, based his conclusions on the output of two machines, an infrared spectrometer and a gas chromatograph. *Id.* at 361. He did not perform the tests himself but relied on the instruments' output, a report prepared by the person who *had* performed the tests, and that other person's lab notes (which persuaded the testifying chemist that the other chemist had prepared the samples and run the tests correctly). *Id.* The court determined that the instruments' readouts were not statements (citing *Washington*) and the chemist could analyze and reach conclusions about the data that the other chemist had obtained without offending the Confrontation Clause. *Id.* at 362.

Our case is similar factually to *United States v. Turner*, 591 F.3d 928, 930 (7th Cir. 2010), where a supervising chemist testified about the substances purchased from a defendant even though he had not performed the actual test on the substances. The supervisor, a senior chemist who headed the drug identification unit in a state crime lab, testified about the procedures employed in his lab for processing and testing substances, including the calibration of machines each day they were used and the use of blank samples to avoid contamination or carryover from previous testing. *Id.* He also described how substances were tested, and explained that each chemist's analysis was required to undergo a peer review. *Id.* at 930-31. Based on his peer review of the work of the chemist who *had* tested the sample connected with the defendant, including that other chemist's report, her handwritten notes, and the machine-generated data, the supervisor was able to reach an opinion about the nature of the substance connected to the defendant. *Id.* at 931.

Citing its prior ruling in *Moon* and given the facts before it, the court found no Confrontation Clause problem with allowing the government's expert witness to rely on information gathered and produced by a lab employee who did not testify. *Id.* at 932-33. Notably, the court also concluded that *Melendez-Diaz* did not control the outcome of the case given the significant factual dissimilarities between the two, especially the fact that conclusions were presented to the jury through the live testimony of an expert witness as opposed to through sworn affidavits as had occurred in *Melendez-Diaz. Id.* at 934.

Based on the record before us, we do not find that the trial court's admission of Walls' testimony regarding the results of blood alcohol tests conducted by McClure and Genaro was contrary to or involved an unreasonable application of *Crawford* or that it was based on an unreasonable determination of the facts in light of the evidence presented in state court. Other courts have similarly concluded that *Crawford* does not preclude the admission of testimony in situations similar to those in this case. *See, e.g., Vega*, 2010 WL 1685819, at *9 (noting that after *Crawford*, several courts including the Second Circuit had determined that an autopsy report was not "testimonial" within the meaning of *Crawford*, so that a medical examiner could testify about the results of an autopsy performed by another without offending the Confrontation Clause; *Alexander*, 2010 WL 404072, at *4 (*Melendez-Diaz* was easily distinguishable because, rather than reading a report into evidence, the forensic chemist testified after independently reviewing the report and notes of the chemist who had performed the substance analysis, independently analyzed the test results,

visually inspected the drugs, and reached his own independent opinions regarding the substances of the drug exhibits); *Larkin*, 2009 WL at 2049991, at *1 (testifying supervisor independently reviewed all relevant data related to DNA test results and offered her own independent interpretation of that data, and the bulk of her testimony revolved around her own expertise in DNA testing and her own conclusions regarding the data she reviewed). Petitioner has not met his burden for habeas relief.

Even if *Melendez-Diaz* did apply retroactively, it is factually distinguishable for the reasons stated above, and *see, e.g., Turner*, 591 F.3d at 934, thus its holding does not dictate the outcome of our review. But if *Melendez-Diaz* applied retroactively and we were to determine that Walls' testimony had been improperly admitted pursuant to *Crawford* and *Melendez-Diaz*, Petitioner is entitled to habeas relief only if he can show that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (applying a harmless error standard on collateral review of constitutional errors in the trial court; habeas petitioners are "not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'") (internal citation omitted). *See also, Larkin*, 2009 WL 2049991, at *2 - *3 (applying a harmless error analysis to petitioner's Confrontation Clause claim).

It is important to remember that the disputed testimony concerns the issue of Petitioner's blood alcohol content at the time of the crash. Impairment was a necessary element of the state's case against Petitioner. But Walls was not the only witness who provided evidence of Petitioner's impairment.

Of significance is the fact that the jury heard from another expert on this very subject. Dr. Todd, the emergency room physician who treated Petitioner later that evening, testified that toxicology reports for blood drawn at the hospital revealed Petitioner's blood alcohol content was .272. Petitioner is not challenging admission of this testimony. In addition, several of the officers who responded to the scene testified that Petitioner smelled of alcohol – one officer said he "reeked" of alcohol – and appeared impaired by alcohol. They also reported other indicia of intoxication: he had glossy and bloodshot eyes, slow speech, and was very unsteady on his feet. Petitioner told one of the officers that he blacked out before coming to and running away.

We simply disagree with Petitioner that the evidence on impairment was "evenly balanced." [D.E. 29 at 12-13]. Thus, admission of Walls' testimony concerning the results of tests performed by McClure and Genaro did not impermissibly "reinforce[] and bolster[]" the hospital toxicological results. If admission of Walls' testimony was erroneous, it was merely cumulative of other uncontradicted evidence from which the jury could readily find that Petitioner was legally impaired at the time of the accident. Admission of Walls' testimony did not have a substantial and injurious effect on the jury verdict and was harmless error, if error at all.

Before turning to the next issue, we acknowledge that after the parties filed supplemental briefs (at our direction) that addressed, among other issues, the effect and relevance of *State v. Johnson*, 982 So. 2d 672 (Fla. 2008), to Petitioner's case, the Florida Supreme Court issued *Smith v. State*, 28 So. 3d 838 (Fla. 2009). This case underscores the distinction between out-of-court sworn statements offered at trial in

lieu of live testimony which *Crawford, Melendez-Diaz,* and *Johnson* dealt with, and the live testimony of a supervisor who formulated his or her own conclusions based on an independent assessment of raw data and other scientific evidence as was the case in *Moon, Washington, Turner, Smith*, and our case.  The *Smith* decision reflects, we think, how the Florida Supreme Court would view the admissibility of Walls' testimony in a state court proceeding, and it clearly supports our conclusion that the trial court did not err in admitting Walls' testimony on the blood alcohol test results.

In *Johnson*, the Florida Supreme Court held that admission of an FDLE lab report establishing the illegal nature of substances seized from the defendant as a business record under the hearsay rule was error.  982 So. 2d at 680-81.  The court determined that the lab report, which was prepared by FDLE in anticipation of criminal prosecution and not, for example, by a hospital where testing was done almost exclusively for medical treatment, was testimonial in nature and not admissible as a business record under the hearsay rule.  *Id.* at 676-78.  Accordingly, the report could be admitted against the defendant only when the preparer was unavailable and the defendant had a prior opportunity for cross-examination.  *Id.* at 681.

The facts in *Smith* are much more akin to those in our case.  The court there held that admission of testimony regarding the results of a DNA test by the supervisor of the analysts who conducted the test did not violate the defendant's right to confrontation.  28 So. 3d at 11.  The court distinguished *Johnson*, explaining:

> Here, it was the supervisor in her capacity as the head of an FBI DNA-analysis team who evaluated the raw test results obtained by the biologists on her team and compared the DNA sample found on the victim's shirt to the sample taken from Smith.  She was the person who

concluded that Smith's DNA matched the DNA from the shirt and calculated the probability of a random individual from the pertinent sample group submitting a DNA sample that matched the sample obtained from the shirt. Thus, although the FBI team supervisor did not perform each actual test on the material found on the shirt and the buccal swab taken from Smith, *she was the person who interpreted the data obtained from the testing and formulated the conclusions that incriminated Smith in the sexual battery. Thus, while the results that the supervisor obtained in this case were indubitably testimonial in nature, she was present at trial and subject to cross-examination with regard to those results.*

*Id.* at 854 (emphasis supplied).

The court expressly approved the rationale of *Moon* and *Washington* in concluding that the Confrontation Clause does not require an expert to have performed the actual lab work to permissibly testify with regard to conclusions she has drawn from those results. *Id.* at 854-55. Because the supervisor in *Smith* had formulated her own conclusions from raw data produced by biologists under her supervision and control, and she was subject to cross-examination with regard to those conclusions, her testimony did not implicate the Confrontation Clause. *Id.* at 855.[18]

---

[18]       Of particular interest is the *Smith* court's observation that *Melendez-Diaz* was distinguishable:

The recent decision of the United States Supreme Court in *Melendez-Diaz* [] does not impact our holding today. In fact, the Supreme Court concluded that our decision in *Johnson* with regard to the Confrontation Clause was consistent with its holding in *Melendez-Diaz*. In *Melendez-Diaz*, the analysts who conducted the tests that led to the conclusion that the defendant possessed cocaine did not testify during trial-instead, only affidavits which reported the results of the testing were introduced. We conclude that the present case is distinguishable from and not controlled by *Melendez-Diaz* because, as previously noted, the FBI team supervisor who interpreted the data, formulated the conclusions, and prepared the report that implicated Smith in the sexual battery actually testified during trial.

Our case is factually analogous to *Smith*.  Walls performed a similar role within the context of his forensic lab.  He ensured protocols were followed in his forensic lab. He directly supervised the toxicologists who ran Petitioner's blood samples through the gas chromatograph.  He conducted a second, independent analysis of McClure's and Genaro's testing; from there he drew his own conclusions about the alcohol content of Petitioner's blood.  Test results were only finalized after Walls approved them.  Finally, Walls was subject to cross-examination at trial about his conclusions.  The Confrontation Clause was not implicated by Walls' testimony.

In conclusion, for the reasons stated above, we hold that Petitioner has failed to demonstrate entitlement to federal habeas relief on his Confrontation Clause claim.

### 3.   *Accident Reconstruction Expert Testimony*

Finally, Petitioner contends it was reversible error to permit Dr. Fogarty, the state's accident reconstruction expert, to testify that the Mazda truck was, "to the exclusion of reasonable doubt," traveling at the rate of 85 miles per hour at the time of the collision.  According to Petitioner, this expert testimony concerned the critical question of whether or not Petitioner caused the accident in question and was, therefore, an opinion as to Petitioner's guilt, not merely as to the speed of the Mazda at impact.  As such, he contends it invaded the province of the jury on the ultimate question of whether he was guilty of causing the accident to the exclusion of all reasonable doubt.

---

28 So. 3d at 855 n.12 (internal citations omitted).  We reach the same conclusion as *Smith* on similar facts.

Examination of the record reveals that Dr. Fogarty did not in fact opine about

Petitioner's speed to the exclusion of all reasonable doubt.

| | |
|---|---|
| PROSECUTOR: | Based on your reconstruction of this traffic crash, do you have an opinion within a reasonable degree of scientific certainty and to the exclusion of all reasonable doubt of the speed of the Mazda at the point that it impacted the Oldsmobile? |
| DEFENSE COUNSEL: | Objection.   Asking beyond all reasonable doubt. Furthermore, I don't believe it's proper – |
| THE COURT: | No speaking objections, Counsel. |
| DEFENSE COUNSEL: | Objection. |
| THE COURT: | Thank you.  Overruled.  It is his opinion. |
| PROSECUTOR: | Do you have such an opinion, sir? |
| DR. FOGARTY: | Yes, I do. |
| PROSECUTOR: | Please, put on this board here the speed you believe the Mazda was traveling at the point that it impacted the Oldsmobile.   At impact, the Mazda and the Oldsmobile. |
| DR. FOGARTY: | Minimum speed would be 85 miles-per hour at the time the initial impact took place for the Mazda. |

[D.E. 18, T. Vol. 5 at 816-17].  It is clear that Dr. Fogarty did *not* answer the "beyond

a reasonable doubt" question.  Rather, after counsel's objection (which admittedly was

overruled), the prosecutor carefully asked him to opine what speed he believed the

Mazda was traveling at impact, to which he answered, simply, 85 miles per hour.  The

jury heard Dr. Fogarty's opinion that the Mazda was traveling at 85 mph, not that the

Mazda was traveling at 85 mph to the exclusion of all reasonable doubt.

Then, after the allegedly objectionable testimony, defense counsel took full advantage of the opportunity to cross-examine Dr. Fogarty about his opinions regarding the speed at impact. It is also important to note that Dr. Fogarty was not the only accident reconstruction expert to testify at trial. The defense presented its own expert (Swope) whose testimony was at odds with Dr. Fogarty's on the issue of the speed at impact. Additionally, Corporal Bostic's testimony supported Petitioner's theory that he was not the sole cause of the accident. Finally, the trial court instructed the jury prior to deliberations that expert witnesses are like other witnesses and that the jury could believe or disbelieve their testimony. As already mentioned, we must presume in the absence of evidence to the contrary that the jury followed the trial court's instructions.

Even if we assume the trial court erred in allowing impermissible opinion testimony as claimed, we apply the harmless error standard enunciated above to determine whether the error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Petitioner is not entitled to habeas relief unless he can establish that trial error resulted in "actual prejudice." *Id.* *See also Crane v. Kentucky*, 476 U.S. 683, 689-90 (1986) ("We acknowledge [] our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts. . . . [T]he Constitution leaves to the judges who must make [a myriad of decisions regarding the admissibility of evidence] 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.' (citation omitted)). Under

the circumstances of this case, we do not find the error in allowing this one opinion, if it was error, had a substantial and injurious effect or influence on the jury verdict or that it affected Petitioner's right to a fair trial.  The record does not reflect that the state court proceedings engendered a result that was contrary to clearly established federal law or were based on an unreasonable determination of the facts.  Therefore, the petition for habeas relief must be denied on this ground, too.

### III.    CONCLUSION

For the foregoing reasons, it is hereby **RECOMMENDED** that Petitioner Eduardo Galiana's Petition for Writ of Habeas Corpus pursuant to Title 28 U.S.C. § 2254 [D.E. 1] be **DENIED** in all respects.

Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein.  *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND ORDERED** in Chambers at Miami, Florida, this 5th day of July, 2010.

EDWIN G. TORRES
United States Magistrate Judge